**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

DANITA F.,

                  Plaintiff,

     v.

COMMISSIONER OF SOCIAL
SECURITY,

                  Defendant.

Civil Action
No. 20-13285 (CPO)


**OPINION**

---

**<u>APPEARANCES</u>**:

Richard Lowell Frankel
Jennifer Stonage
BROSS & FRANKEL, PA
725 Kenilworth Ave
Cherry Hill, NJ 08002

    *On behalf of Plaintiff.*

Rachel A. Honig
Acting United States Attorney
U.S. DEPARTMENT OF JUSTICE
    OFFICE OF THE U.S. ATTORNEY
401 Market Street
P.O. Box 2098
Camden, NJ 08101

Kristina C.E. Cole
SOCIAL SECURITY ADMINISTRATION
    OFFICE OF THE GENERAL COUNSEL
P. O. Box 41777
Philadelphia, PA 19123

    *On behalf of Defendant.*

**O'HEARN, District Judge.**

This matter comes before the Court on Plaintiff Danita F.'s[1] appeal from a denial of Social Security disability benefits by the Acting Commissioner of Social Security ("Defendant"). The Court did not hear oral argument pursuant to Local Rule 9.1(f). For the reasons that follow, the Court **AFFIRMS** the Administrative Law Judge's ("ALJ") decision.

## I.      BACKGROUND

The Court recites herein only those facts necessary for its determination on this Appeal.

### A.  Administrative History

On January 19, 2017, Plaintiff protectively filed applications for Social Security benefits under Title II for a period of disability and disability insurance benefits ("DIB") and Title XVI for supplemental security income ("SSI"), alleging that she has been disabled since October 26, 2015. (Pla. Compl., ECF No. 1); (AR 10). The applications were denied initially on April 19, 2017, and upon reconsideration on July 11, 2017. (Pla. Br., ECF No. 14 at 1); (AR 10). Thereafter, Plaintiff filed a written request for a hearing before an ALJ on August 8, 2017. (AR 10). The ALJ held a hearing on March 22, 2019, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. (AR 34–59). In a decision dated May 28, 2019, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act from October 26, 2015, the alleged disability onset date, through the date of that decision. (AR 18–19). That decision became the final decision of the Acting Commissioner of Social Security when the Appeals Council declined review on July 23, 2020. (AR 1–3). Plaintiff timely filed this appeal on September 25, 2020 pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The matter is now ripe for disposition.

---

[1]  Pursuant to this Court's Standing Order 2021-10, this Opinion will refer to Plaintiff solely by first name and last initial.

### B. Plaintiff's Background and Testimony

At the alleged onset of disability, Plaintiff was 50 years old. (AR 18). She lives with her son and partner in New Jersey. (AR 40). She and her spouse have been separated since 1988. (AR 267). She earned her GED and can communicate in English. (AR 41, 266). As a result of a work-related injury that occurred in early May 2012, Plaintiff alleges that she became disabled on October 25, 2015. (AR 41, 416, 421).

In her initial claim on November 3, 2015, Plaintiff complained of suffering from a bulging disc. (AR 61). At her administrative hearing, Plaintiff testified that she experiences "chronic pain" throughout her neck, shoulders, and arms, describing the pain as "burning . . . heavy . . . it feels like electrical shocks." (AR 45). Plaintiff explained that she struggles sometimes to "even open up a water bottle." (AR 45). She described shooting pains up into her head that cause headaches two times a week, awakens her during the night, and lasts from an hour to an hour and a half. (AR 46–47). Plaintiff testified that she takes Tylenol and lays down to alleviate the pain of the headaches and that exposure to light occasionally makes the headaches worse. (AR 47). Plaintiff also described that the pain radiating from her neck goes down the right side, but "not as often" as it does on the left. (AR 48).

Plaintiff alleges difficulty with daily activities, explaining that it is sometimes difficult to concentrate while watching television due to the pain. (AR 51). Plaintiff testified that she has difficulty washing herself and putting clothes on. (AR 47). She testified that she has difficulty putting pants on, and requires help to bathe because she cannot reach her back or feet. (AR 45, 47). She stated that her partner and her son do household chores like preparing meals, cleaning, and doing laundry, but that she washes some dishes. (AR 54). Plaintiff testified that she has not slept in her bed in two years because it is difficult for her to get up and instead sleeps in a recliner.

(AR 52–53).

Plaintiff further testified that she was involved in a car accident on November 9, 2018, and because of that accident, she experiences pain in her mid-back and has difficulty sitting down. (AR 49–50). Plaintiff testified that she could sit or stand for a maximum of 35 to 40 minutes before her back starts to hurt. (AR 50). Plaintiff further testified that she can walk at most half a block before she experiences pain that causes exhaustion and requires her to "lean up against a wall or something." (AR 50–51).

Plaintiff testified that she takes medication for her anxiety daily which sometimes causes grogginess. (AR 51-52). Plaintiff testified that she also feels groggy from other medications such as muscle relaxers and Percocet. (AR 52). Plaintiff also described blurry vision from her diagnosis of Grave's disease. (AR 53). She explained that the blurry vision is corrected by wearing glasses. (AR 53).

### C.  Medical History

Plaintiff has been examined by numerous medical professionals over the course of the last decade, and throughout the pendency of her disability claim. The Court will briefly summarize the relevant medical evidence for purposes of this Appeal. This recitation is not comprehensive.

#### 1.  John L. Gaffney, D.O.

On January 8, 2014, John L. Gaffney, D.O., examined Plaintiff for pain experienced after she was assaulted by a client at work in May 2012. (AR 416–20). Dr. Gaffney's examination was for the sole purpose of evaluating disability. (AR 420). Referencing her prior medical history, Dr. Gaffney recounted that Plaintiff received immediate care and treatment resulting in a diagnosis of face and scalp contusion with cervical strain. (AR 419–20). After the pain persisted, Plaintiff was referred for an MRI scan of the cervical spine. (AR 417). The MRI scan revealed a bulging disc

with partial foraminal compromise at C5-6 and bulging discs at C3-4, C4-5, and C6-7. (AR 417). Thereafter, Plaintiff received treatment, yet continued to complain of neck pain with radiation into her shoulders and left arm. (AR 417). She complained of difficulty lifting, reaching above her head, completing routine daily activities, and driving. (AR 417–18).

A physical examination also showed spasm with tenderness in her cervical spine, sensory deficit over the C5-6 dermatomal region into the bilateral arms, 4/5 muscle strength in the left arm, 4+/5 muscle strength in the right, reduced cervical range of motion, shoulder tenderness, positive Neer and Hawkins signs in both shoulders, and a borderline positive drop arm test on both sides (AR 418–19). Plaintiff also had reduced range of motion in both shoulders. (AR 419). Based on his examination and Plaintiff's subjective reports, Dr. Gaffney diagnosed Plaintiff with impairments including chronic pain, a protruding disc, multiple bulging disks in the cervical spine, persistent and progressive cervical radiculopathy, and cervical fibromyositis syndrome. (AR 419–20).

Dr. Gaffney stated that Plaintiff's injuries have produced "demonstrable objective medical evidence of restriction of function and lessening of a material degree of working ability." (AR 420). Further, Dr. Gaffney assessed 50% permanent/partial disability with respect to Plaintiff's cervical spine related to the 2012 incident, 35% permanent/partial disability with respect to her left shoulder, and 32.5% permanent/partial disability with respect to her right shoulder. (AR 420).

   2.  Sareta Coubarous, D.O.

In March 2016, Sareta Coubarous, D.O., performed a consultative examination of Plaintiff. (AR 409–13). She noted that Plaintiff had a normal gait without assistive device use, had slight difficulty getting up from a chair and on/off the exam table, and held her head stiffly while walking. (AR 411). Plaintiff had reduced cervical spine and shoulder range of motion, a positive Neer's test,

5

a left empty can sign, and a positive apprehension sign. (AR 412). Plaintiff had tenderness and spasm in her cervical spine area, but intact finger dexterity and normal range of motion in her wrists, elbows, hands, and fingers. (AR 412). Her hip range of motion was decreased, but she had normal range of motion in her ankles and knees. (AR 412). Plaintiff's lumbar range of motion was reduced, but she had no spasms and no trigger points. (AR 412). She could stand independently on her right leg without difficulty, but not on her left, and she could not walk on her heels, but could walk heel to toe with some difficulty and could walk on her toes. (AR 412). She was unable to rise from a squat, but had a negative straight leg raising test. (AR 412). Plaintiff had 5/5 strength in her legs, 5/5 in her right arm, and 4/5 in her left arm. (AR 413). She had no muscle atrophy and negative Tinel's and Romberg tests. (AR 413). Her sensation was decreased on the left but intact on the right. (AR 413). An x-ray of her lumbar spine showed mild degenerative changes at L3-4 and L4-5 consistent with a 2013 exam. (AR 414).

Dr. Coubarous assessed rotator cuff syndrome, biceps tendinitis, AC joint dysfunction, shoulder pain, low back pain, neck pain, cervical and thoracic disc herniation, and facet syndrome. (AR 413). Dr. Coubarous opined that Plaintiff was functionally limited with moderate-to-heavy lifting, pushing, pulling, reaching, bending, squatting, and crouching, but functionally intact with walking, sitting, standing, and light lifting. (AR 413).

   3.   Adam Sackstein, M.D.

Adam Sackstein, M.D., treated the Plaintiff for cervical facet joint pain, a prolapsed cervical intervertebral disc, and cervical radiculopathy. (AR 436). In an encounter summary in March 2016, Dr. Sackstein noted on inspection, that Plaintiff's cervical spine had tenderness over paraspinal muscles overlying the facet joints on both sides and pain behaviors within the expected context of disease. (AR 443). In a follow up note in April 2016, Dr. Sackstein noted that Plaintiff

underwent a cervical epidural steroid injection but experienced "no improvement" in her pain and had severe pain and discomfort. (AR 437).

In May 2016, Dr. Sackstein noted that Plaintiff had reached maximum medical improvement and could work full time in a sedentary capacity with a ten-pound lifting and push/pull limit. (AR 432). He noted that she tolerated sitting, standing, and walking without a change of position. (AR 432). Dr. Sackstein noted that Plaintiff denied feeling depressed or anxious and was dependent on others for housekeeping and yardwork. (AR 457). Dr. Sackstein further stated that Plaintiff underwent a cervical facet joint injection which improved Plaintiff's pain by 20% but resulted in more headaches. (AR 457).

4. William P. Anthony, M.D.

William P. Anthony, M.D., performed a consultative orthopedic examination of Plaintiff in April 2017. (AR 473–78). Plaintiff reported that she was not on any prescription pain medication at that time, but that Tylenol helped her cervical and shoulder pain. (AR 473). Plaintiff also reported that she had anxiety and depression, but had never been hospitalized or evaluated for those issues. (AR 473). Dr. Anthony noted that an evaluation for anxiety and depression should be considered. (AR 476). Dr. Anthony also noted that Plaintiff could ambulate for community distances without gait dysfunction or an assistive device and could stand unsupported on her right and left foot, heels, and toes. (AR 474). Dr. Anthony further noted that Plaintiff had reduced cervical range of motion and that a foraminal compression test produced posterior element pain with no radiation. (AR 474). A Spurling's test produced ipsilateral pain in the cervical region with no radiation, and Plaintiff had diffuse tenderness in her paraspinal muscles with no increased tone or triggering. (AR 474). Plaintiff made diffuse complaints of cervical spinous process tenderness, but exam results were inconsistent from trial to trial. (AR 474). Plaintiff had no periscapular,

7

thoracic paraspinal, or spinous process tenderness, and while she reported lumbar tenderness, her reports were inconsistent with Dr. Anthony's exam. (AR 474). She had no increased tone in her lumbar paraspinal muscles, no triggering, and no lumbar spinous process tenderness. (AR 474).

Dr. Anthony's evaluation notes reveal Plaintiff had a negative sealed root test, as well as negative straight leg raising, Lasegue's, and Gaenslen's tests. (AR 475). Passive range of motion of her hips did not provoke pain. (AR 475). Plaintiff's lumbar flexion was 85 degrees "with much encouragement," her extension was 10, and her right and left lateral bending was normal "with much encouragement." (AR 475). Plaintiff gave nonphysiologic effort on rotation and had a range of motion of 45 on the right and 50 on the left. (AR 475). She had a normal range of motion in her shoulders, elbows, forearms, wrists, and fingers. (AR 475). When Dr. Anthony tested her shoulder range of motion, he noted that Plaintiff gave little effort. (AR 475). However, when Plaintiff said her lower back was tightening up, she reached her left hand behind her back with full internal rotation, then brought it above the shoulder and reached for her scapula with full external rotation and abduction, and then performed full flexion. (AR 475). Dr. Anthony noted that it was "peculiar" that she could not do this when asked to do so with range of motion testing. (AR 475).

Plaintiff had negative Tinel's tests and normal strength in her arms, and her fine motor function and grip strength were normal. (AR 475). She had no sensory loss, no atrophy, no clonus, normal leg range of motion, and normal strength. (AR 475). Dr. Anthony noted that his findings on examination were somewhat limited and primarily included statements of complaints of pain and limitation of range of motion in her cervical region actively. (AR 476). He also observed that an MRI showed multiple herniations, but did not have a copy of it to review. (AR 476).

5.  Kelly Hoffman, P.A.-C

On April 3, 2019, Ms. Hoffman treated plaintiff for cervical radiculopathy, cervical

displacement, cervical degeneration, and lumbago. (AR 528–34). She reported that Plaintiff had

been treated by her office, Advanced Medical Care Center, from February 2018 through the date

of her opinion. (AR 528). Ms. Hoffman indicated that Plaintiff had symptoms of musculoskeletal

pain in the neck and low back, extremity numbness/pain/tingling, and muscle spasm, but no

weakness, difficulty walking, or psychological symptoms. (AR 528). She noted that Plaintiff had

a 25% decrease in cervical range of motion and moderate muscle spasms and that drowsiness,

lethargy, and fatigue were "potential" side effects from Plaintiff's pain medications which could

be expected to limit Plaintiff's focus for significant periods of time. (AR 529). She also opined

that Plaintiff would frequently and unpredictably need to lie down for 1.5–2 hours a day. (AR 530).

She observed a herniated disc in an MRI scan and opined that Plaintiff could occasionally reach

and never handle or finger. (AR 532). She also opined that due to low back pain, Plaintiff could

sit less than six hours, stand/walk for less than two hours, and lift less than ten pounds occasionally.

(AR 534).

## II.   **LEGAL STANDARD**

### A.  **Standard of Review**

In reviewing applications for Social Security disability benefits, this Court has the authority

to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204 F.3d 78, 83

(3d Cir. 2000). In contrast, the Court reviews the ALJ's factual findings to determine if they are

supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42

U.S.C. §§ 405(g), 1383(c)(3). The United States Supreme Court has explained this standard as

follows:

> Under the substantial-evidence standard, a court looks to an existing administrative
> record and asks whether it contains sufficien[t] evidence to support the agency's
> factual determinations. And whatever the meaning of substantial in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial evidence, this

Court has said, is more than a mere scintilla. It means — and means only — such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations and quotation marks omitted); *see also Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (internal citations and quotations omitted).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g., Fargnoli v. Halter*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.").

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K. on behalf of K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018) (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (internal citations and quotations omitted)). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.,* 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)).

### B.  Sequential Evaluation Process

The Commissioner of the Social Security Administration has promulgated a five-step, sequential analysis for evaluating a claimant's disability, as outlined in 20 C.F.R. §§ 404.1520(a)(4)(i)–(v). The analysis proceeds as follows:

> At step one, the ALJ determines whether the claimant is performing "substantial gainful activity[.]" If he is, he is not disabled. Otherwise, the ALJ moves on to step two.
>
> At step two, the ALJ considers whether the claimant has any "severe medically determinable physical or mental impairment" that meets certain regulatory requirements. A "severe impairment" is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" If the claimant lacks such an impairment, he is not disabled. If he has such an impairment, the ALJ moves on to step three.
>
> At step three, the ALJ decides "whether the claimant's impairments meet or equal the requirements of an impairment listed in the regulations[.]" If the claimant's impairments do, he is disabled. If they do not, the ALJ moves on to step four.
> At step four, the ALJ assesses the claimant's "residual functional capacity" ("RFC") and whether he can perform his "past relevant work." A claimant's "[RFC] is the most [he] can still do despite [his] limitations." If the claimant can perform his past relevant work despite his limitations, he is not disabled. If he cannot, the ALJ moves on to step five.
>
> At step five, the ALJ examines whether the claimant "can make an adjustment to other work[,]" considering his "[RFC,] . . . age, education, and work experience[.]" That examination typically involves "one or more hypothetical questions posed by the ALJ to [a] vocational expert." If the claimant can make an adjustment to other work, he is not disabled. If he cannot, he is disabled.

*Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 201–02 (3d Cir. 2019) (alterations in original; citations and footnote omitted).

### III.   __ALJ DECISION__

Plaintiff met the insured status requirements of the Social Security Act through December 31, 2021. (AR 12). At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity between October 26, 2016, the alleged disability onset date, and the date of the ALJ's decision. (AR 12).

At Step Two, the ALJ found that Plaintiff suffered from the following medically determinable severe impairments: "degenerative disk disease, cervical spine, and herniated cervical disc." (AR 12). The ALJ found that Plaintiff's diagnosed Grave's disease and hypertension were not severe. (AR 12–13). In addition, the ALJ found that the Plaintiff's diagnosis of anxiety and depression, and the treatment thereof, were not medically determinable. (AR 13).

At Step Three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. (AR 13).

At Step Four, the ALJ found that Plaintiff had the RFC to perform light work subject to various additional limitations. (AR 13–17). The ALJ also found that this RFC did not permit the performance of Plaintiff's past relevant work as a residential rehabilitation aide. (AR 18).

At Step Five, the ALJ found that a significant number of jobs—i.e., approximately 7,319 jobs as a survey worker; approximately 8,334 investigator accounts jobs; and approximately 4,708 jobs as an office helper—existed in the national economy and could be performed by an individual with Plaintiff's vocational profile and RFC. (AR 19). The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from October 26, 2015, her alleged disability onset date, through the date of the decision. (AR 19–20).

Plaintiff argues that the ALJ erred in finding her mental health non-severe at Step Two and that the ALJ further erred in failing to incorporate into the RFC limitations consistent with mental

12

health and Plaintiff's medications. (Pla. Br., ECF No. 14). Plaintiff also argues that the ALJ erred in giving too little weight to certain medical opinions and asks that the decision of the Commissioner be reversed and remanded with directions for the granting of benefits or, alternatively, for further proceedings. (Pla. Br., ECF No. 14; Pla. Reply Br., ECF No. 20). The Commissioner takes the position that the ALJ's decision should be affirmed in its entirety because it correctly applied the governing legal standards, considered the entire record, and reached a decision supported by substantial evidence. (Def. Br., ECF No. 15).

## IV.   DISCUSSION

In her appeal, Plaintiff identifies two specific alleged errors within the ALJ's decision regarding her disability benefits claim. The Court will address each of these arguments in turn. For the reasons that follow, the Court affirms the ALJ's decision.

### A.  Assessment of Mental Health at Step Two and for Plaintiff's RFC.

Plaintiff argues that the ALJ erred in finding her mental health non-severe at Step Two and further erred in failing to incorporate limitations consistent with same in the RFC. (Pla. Br., ECF No. 14 at 14–18). The Court disagrees.

At Step two of the sequential evaluation process, the ALJ considers whether a claimant's impairment is (1) medically determinable or non-medically determinable, and (2) severe or non-severe; this step is essentially a threshold test. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); SSR 85-28, 1985 WL 56856. The ALJ's Step Two analysis need not exhaustively address every condition from which a claimant may suffer that could arise to a severe impairment, as Step Two is merely a "de minimis screening device" used to "dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003).

Typically, when an ALJ finds that the claimant has at least one severe impairment at Step Two and continues onto the subsequent steps, omission of another impairment, or the

determination that an impairment is not severe, is harmless error. *Richardson v. Comm'r of Soc. Sec.*, 2017 WL 6550482, at *5 (D.N.J. 2017) (citing *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) ("Because the ALJ found in [Plaintiff]'s favor at Step Two, even if he had erroneously concluded that some of h[is] other impairments were non-severe, any error was harmless."); *Rutherford v. Barnhart*, 399 F.3d 546, 552–53 (3d Cir. 2005)).

The error at Step Two is only harmless, however, where the ALJ has considered the medically determinable impairment in the RFC determination and it would not otherwise affect the subsequent RFC analysis and outcome of the case. *Cf. Robert E. v. Comm'r of Soc. Sec.*, No. 20-06882, 2021 WL 5277193 at *8 (D.N.J. Nov. 12, 2021). The RFC assessment must take into consideration all of a claimant's medically determinable impairments in combination, including those that the ALJ has found to be severe, as well as those that the ALJ has not deemed to be severe at Step Two. *Id.* at *8–9; *see* 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . . when we assess your residual functional capacity."). If the ALJ finds the impairment non-medically determinable, yet still includes it in the subsequent RFC, it is harmless error. However, if the ALJ errs in finding an impairment non-medically determinable and does not include it in the RFC, the subsequent analysis is defective.

The ALJ did not err at Step Two and his conclusion that mental health was non-medically determinable was supported by substantial evidence. Plaintiff argues that "the ALJ did not state that the Plaintiff's mental health impairments were not medically determinable, he stated that they were non-severe at Step Two." (Pla. Reply Br., ECF No. 20, p. 3). This argument is misguided. The ALJ stated that mental health is non-medically determinable:

> [t]he record also indicated that the claimant was diagnosed with anxiety and depression. However, the record did not contain mental health treatment records or

objective mental health examinations. She was on anxiety medication. Due to the lack of available evidence and treatment, *the claimant's anxiety and depression were non-medically determinable.*

(AR 13) (emphasis added). Plaintiff fails to appreciate the distinction between an impairment that is non-severe and one that is non-medically determinable. Medical determinability is a necessary condition of a severe or non-severe impairment. In other words, a severe or non-severe impairment will always be medically determinable, but a non-medically determinable impairment cannot be said to be anything, i.e., it can be neither severe nor non-severe because the ALJ cannot objectively determine it. This distinction is important because if the ALJ in fact erred, it determines whether that conclusion was harmless.

To establish a medically determinable impairment:

[The] impairment(s) must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source. We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).

20 C.F.R. §§ 404.1521, 416.921. Objective medical evidence means signs,[2] laboratory findings,[3]

---

[2]  POMS, DI 24501.020. Signs are

one or more anatomical, physiological, or psychological abnormalities that are observable, apart from the claimant's statements (description of symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. Psychiatric signs must be shown by observable facts that can be medically described and evaluated.

[3]  POMS, DI 24501.020. Laboratory findings are "one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques. Diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests."

or both. A Plaintiff's "statement of symptoms, a diagnosis, or a medical opinion" is insufficient to establish the existence of a medically determinable impairment. *Id.*

Plaintiff does not, and cannot, cite to any objective medical evidence in the record that shows medical signs or laboratory findings of anxiety or depression. She relies only on her subjective oral testimony, diagnosis, and treatment which are not medical signs or laboratory findings. To the contrary, throughout 2015 and 2016, Dr. Sackstein's records show Plaintiff did not report any anxiety or depression. (AR 431, 438, 443, 448, 453). In that same period, Dr. Ragone noted that Plaintiff was oriented with intact judgement, and fluent speech. (AR 422, 427, 520, 523, 526). Dr. Ragone further recorded in multiple progress notes that Plaintiff's affect was grossly intact. (AR 520, 523, 526).

Progress notes show that Dr. Anthony recommended that Plaintiff undergo objective testing for her anxiety claims, (AR 476), but no such evaluation ever took place. Any mention of mental health in the record is a result of Plaintiff's subjective complaints and doctors' responses thereto. The record is devoid of any objective medical evidence such that the ALJ could classify Plaintiff's alleged mental health as a medically determinable impairment. As such there is substantial evidence to support the ALJ's conclusion.

Plaintiff then argues that the ALJ erred in failing to incorporate limitations consistent with Plaintiff's medications. (Pla. Br., ECF No. 14 at 14-18). Plaintiff alleges side effects from medications stemming from her alleged mental health impairment and her physical impairments. (AR 52). Addressing first Plaintiff's argument that the ALJ did not consider Plaintiff's testimony regarding her side effects, Plaintiff stated that her anxiety medication "makes [her] groggy" and that this causes her to take naps during the day. (AR 52).

However, because the ALJ determined that Plaintiff's mental health impairments were non-

medically determinable, the ALJ was not required to consider such impairments in the residual

functional capacity analysis. As this Court has previously explained:

> If a claimant has demonstrated at least one severe medically determinable
> impairment, the ALJ must consider that severe impairment in combination with all
> the additional medically determinable impairments in combination while
> formulating the RFC. *See* SSR 16-3p. An ALJ may only disregard an impairment
> in the RFC determination if that impairment has not been found to be medically
> determinable and has no demonstrable symptoms. *See Diciano v. Comm'r of Soc.
> Sec.*, 2019 U.S. Dist.  2019 WL 6696523, at *4 (D.N.J. 2019) (explaining that "[i]t
> is true that an ALJ must assess a claimant's severe impairments in combination with
> non-severe impairments," but "an ALJ does not have to consider an alleged
> impairment if he does not find such an impairment is medically determinable")
> (citing 20 C.F.R. § 404.1529; POMS, DI 25205.005 20 C.F.R. § 404.1545(a)(2)).

*Robert E.*, No. 20-06882, 2021 WL 5277193, at *7 (D.N.J. Nov. 12, 2021). Simply put, by finding

anxiety and depression non-medically determinable, the ALJ had no obligation to analyze the

alleged side effects that stemmed from them.

As for side effects from Percocet and Flexeril, medications that treat pain stemming from

Plaintiff's medically determinable physical impairments, Plaintiff relies on the Court in *Stewart* to

argue that the ALJ should have specifically addressed the side effects in the RFC where he rejected

the Plaintiff's testimony. (Pla. Br., ECF No. 14 at 17); *Stewart v. Secretary of Health, Educ. &

Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). However, the ALJ does not reject Plaintiff's testimony

of grogginess and fatigue — to the contrary, the ALJ found that Plaintiff had medically

determinable impairments and granted her appropriate limitations. (AR 16). The ALJ explicitly

considered the alleged side effects of grogginess and fatigue when assessing Ms. Hoffman's

opinion:  "the [plaintiff]'s work functioning would be affected by medication side effects. She was

expected to need rest for a total of one and a half to two hours at least three days per week. Her

need to rest was unpredictable." (AR 17). In light of this, and other evidence in the record such as

Plaintiff's ability to complete her daily activities, the ALJ concluded that Plaintiff could stand for

six hours in an eight hour day, but only for one hour at a time before needing to sit for 2–3 minutes. (AR 13). The Court finds no error in this process or conclusion.

Since the Court finds that there was substantial evidence to support the ALJ's conclusion that Plaintiff's mental health was not medically determinable, the ALJ was not required to address it under either the "Special Technique argument" or the RFC analysis.[4] As for Plaintiff's side effects from medication stemming from medically determinable impairments, the Court finds the ALJ addressed them in his RFC and assigned a limitation that was supported by substantial evidence. Plaintiff's arguments in these regards are therefore without merit.

**B. Whether the ALJ was supported by substantial evidence in giving little weight to the opinions of Dr. Gaffney and Kelly Hoffman, P.A.-C and partial weight to the opinion of Dr. Sackstein.**

Plaintiff argues that the ALJ erred in giving little weight to the opinions of Dr. Gaffney and Kelly Hoffman, and only partial weight to the opinion of Dr. Sackstein. (Pla. Br., ECF No. 14). This Court disagrees, finding that the ALJ properly explained the weight given to each opinion.

The Court will first address the medical opinions of the two Physicians, then consider the other opinion by the Physician Assistant. When faced with conflicting opinion evidence, an ALJ has significant discretion in choosing whom to credit. *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011) (citation omitted) ("[T]he ALJ is entitled to weigh all evidence in making its finding . . .

---

[4] Plaintiff argues that the ALJ was required to use the "psychiatric review technique" described in 20 C.F.R. §§ 404.1520(a) and 416.920(a).   (Pla. Br., ECF No. 14 at 16). However, the adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. (SSR 96-8p). Therefore, the ALJ was not required to use this technique to assess the severity because they were non-medically determinable mental impairments.

[and] is not bound to accept the opinion or theory of any medical expert, but may weigh the medical evidence and draw its own inferences."). In general, the ALJ should accord great weight to treating physicians' reports, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987); 20 C.F.R. § 404.1527(d)(2). "An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." *Plummer*, 186 F.3d at 429 (citing *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985)). 20 C.F.R. §§ 404.1527(c)(1–6) and 416.927(c)(1–6) provide a list to consider in determining the weight afforded to opinions, including the treatment relationship, length of relationship, frequency of examination, nature and extent of the treatment relationships, supportability of the opinion afforded by the medical evidence, consistency of the opinion with the record as a whole, and specialization of the treating physician. *Russo v. Astrue*, 421 Fed. Appx. 184, 191 (3d Cir. 2011).

Here, the ALJ considered the opinion of Dr. Gaffney, appropriately giving it little weight for the valid reason that the examination on which it was based was conducted before the alleged onset of disability. Dr. Gaffney's medical opinion included an examination showing bilateral shoulder pain cervical spasm, sensory deficit with pin prick in the cervical spine and progressing cervical radiculopathy. (AR 416–420). However, the ALJ reasoned that "[w]hile the assessment provided insight into the history of [Plaintiff's] conditions, it was too remote from the alleged onset date to provide insight into the claimant's conditions as of that date." (AR 17). This examination occurred in January 2014, more than a year and a half prior to Plaintiff's alleged onset of disability in October, 2015, (AR 12, 416–20), and it is clear that an ALJ may assign little weight

to a medical opinion prior to the relevant period. *See Gonzalez v. Colvin*, Civ. A. No. 14-4608, 2016 WL 1463990, at *4 (D.N.J. Apr. 13, 2016) (noting that "an ALJ may reject evidence that predates the relevant period") (internal quotation omitted); *Clayton v. Colvin*, No. 14-400, 2014 WL 5439796, at *7 (W.D. Pa. Oct. 24, 2014) (citing *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1165 (9th Cir. 2008) ("Medical opinions that predate the alleged onset of disability are of limited relevance.")).

The ALJ also considered the opinion of Dr. Sackstein, appropriately giving it little weight and setting forth three valid reasons for doing so. Dr. Sackstein opined that Plaintiff could "lift, carry, push, and pull ten pounds [and] [s]he could sit, stand, and ambulate without change of position." (AR 17, 455).  In giving Dr. Sackstein's opinion partial weight, the ALJ reasoned that the opinion was vague, did not indicate any postural maneuvers limitations, and was, in part, not supported by objective evidence in the record. (AR 17). Notably, Dr. Sackstein's opinion makes no mention of postural limitations and does not discuss how long Plaintiff could sit, stand, or walk. (AR 455). Discussing the relevant medical evidence, the ALJ addressed an EMG, that showed no neuropathy or definite radiculopathy, and the observations of Dr. Anthony, who described Plaintiff's "inconsistent" effort to comply with examination requests,[5] neither of which support Dr. Sackstein's opinion. (AR 16, 475). Therefore, there was substantial support for the ALJ's determination that Dr. Sackstein's opinion was vague and inconsistent with the record such that the ALJ did not err in affording it partial weight.

---

[5] When Dr. Anthony tested Plaintiff's shoulder range of motion, he noted that Plaintiff gave little effort. (AR 475). However, when Plaintiff said her lower back was tightening up, she reached her left hand behind her back with full internal rotation, then brought it above the shoulder and reached for her scapula with full external rotation and abduction, and then performed full flexion. (AR 475). Dr. Anthony noted that it was "peculiar" that she could not do this when asked to do so with range of motion testing. (AR 475).

Similarly, the ALJ considered the opinion of Ms. Hoffman and assigned it little weight, noting that Ms. Hoffman's descriptions of limitations were vague and her explanations lacked detail. (AR 17). At the outset, the Court notes it will evaluate Plaintiff's claims under the regulations that were in effect at the time of the claim, including 20 C.F.R. §§ 404.1527 and 416.927, [6] in which physician assistants' opinions were not acceptable medical sources. Instead, Physician assistants were defined as "other sources," and, while not entitled to the same deference, they were entitled to some weight.[7]

Turning to the substance of Ms. Hoffman's opinion, the Court agrees with the ALJ that many of the limitations Ms. Hoffman identified lack detailed explanations. For example, Ms. Hoffman opined that Plaintiff's medication side effects would limit her effectiveness of work duties frequently, defined as "34% to 66% of an 8-hour workday." (AR 529). However, Ms. Hoffman noted that the side effects from medication were merely "potential" side effects; she did not explain whether Plaintiff actually reported these side effects, and her treatment records contain no mention of them. (AR 529; *see also* AR 480–517). Regarding the need for rest, Ms. Hoffman opined that Plaintiff would need to lie down or recline for at least one and a half to two hours per day at least three days per week, on an unpredictable basis, but provided no detailed or specific explanation as to why. (AR 530). As for handling and fingering restrictions, Ms. Hoffman offered only "pain/paresthesias" as an explanation, but other medical records documented normal range

---

[6]  Plaintiff filed a protective claim on January 19, 2017 prior to the new regulation including Physician Assistants as acceptable medical sources. *See* 20 C.F.R. §§ 404.1527 and 416.927 for claims filed before March 27, 2017; *see also* SSR 06-03p (Rescinded by Federal Register Notice Vol. 82, No. 57, page 15263 effective March 27, 2017).

[7]  *See* 20 C.F.R. §§ 404.1527(f) and 416.927(f); *see also* POMS DI 24503.035 Evaluation and Articulation Requirements for Medical Opinions, Opinions, and Prior Administrative Medical Findings - Claims Filed before March 27, 2017 (stating "never assign controlling weight to an opinion or prior administrative medical finding.").

of motion in her wrists, hands, and fingers. (AR 412, 475, 532). Ms. Hoffman noted a limitation of less than two hours of standing/walking, but noted no gait abnormality. (AR 534). Thus, the ALJ's assignment of little weight to Ms. Hoffman was supported by substantial evidence.

On a final note, the Court addresses Plaintiff's argument that the ALJ incorrectly recited part of Ms. Hoffman's opinion. Specifically, the ALJ stated "[Plaintiff] had a reduced range of motion of the cervical and lumbar spine, but the degree of restriction was not noted." (AR 17). However, Ms. Hoffman explicitly noted "25% decrease in range of motion of neck." (AR 529). The Court agrees with Plaintiff that this is, in fact, an error by the ALJ, but disagrees that it requires the remand of Plaintiff's case.

At the first four steps, "[p]laintiff . . . bears the burden, on appeal, of showing not merely that the Commissioner erred, but also that the error was harmful." *Hill v. Comm'r of Soc. Sec.*, No. 19-20115, 2020 WL 7694007, at *2 (D.N.J. Dec. 24, 2020). Where corrected error does not change the outcome, the error is harmless. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009); *Woodson v. Comm'r Soc. Sec.*, 661 F. App'x 762, 765 (3d Cir. 2016). Here, the ALJ considered Plaintiff's specific cervical spine range of motion at three different times in his RFC analysis—correctly reciting her limited range of motion each time.[8] Further, the ALJ did find, considering the entire

---

[8] First, the ALJ considers the more significant reduction in cervical range of motion on January 8, 2019, which was reduced by 40%. (AR 15–16). Then, the ALJ considers the improvement of her cervical spine range of motion, which was only reduced by 20-25% on January 22, 2019. (AR 16). Finally, the ALJ notes that on February 7, 2019, Plaintiff's cervical spine range of motion was reduced to 20%. (AR 16).

record, that Plaintiff was limited to light work.[9] (AR 16). Despite his failure to acknowledge Ms. Hoffman's notation of a specific degree of restriction, there is substantial evidence to support the ALJ's decision to afford Ms. Hoffman's opinion little weight, *see supra* discussion on page 20–21, and the ALJ clearly considered Plaintiff's degree of restriction in his Step 4 analysis. As such, the ALJ's error is insufficient to justify remand.

## CONCLUSION

For the foregoing reasons, the Court **AFFIRMS** the final decision of the Commissioner. An appropriate Order will follow.

*/s/ Christine P. O'Hearn*
**CHRISTINE P. O'HEARN**
**United States District Judge**

---

[9] The ALJ found

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except occasionally climb ramps and stairs; stoop, kneel, crouch, balance, or crawl; never climb ladders, rope, or scaffolds; occasional push pull of controls with the upper and or lower extremities; no overhead reaching frequent handling and fingering; stand for a total of 6 hours in a typical 8-hour day, but only for 1 hour at a time before needing to sit for 2–3 minutes. (AR 13).